MATTHEW P. CLOKE, Respondent, v. ROBINS DRY DOCK AND REPAIR COMPANY, Appellant.

First Department, January 16, 1920.

**Ships and shipping — negligence — liability of dry dock company for personal injuries to person employed on ship while returning thereto — evidence.**

In an action by the chief steward to recover for personal injuries sustained by slipping on some ice and falling between pontoon sections while returning to the ship on which he was employed, which had been placed in the defendant's dry dock, evidence *held* insufficient to show that the defendant was under any obligation to provide a means of access to the ship for the plaintiff or others employed thereon, or that it owed them any greater duty than as mere licensees, or that the plaintiff exercised due care, and, therefore, the judgment in favor of the plaintiff and the order denying defendant's motion for a new trial should be reversed and the complaint dismissed.

APPEAL by the defendant, Robins Dry Dock and Repair Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 26th day of November, 1918, upon the verdict of a jury for $17,000, and also from an order entered in said clerk's office on or about the same day denying defendant's motion for a new trial made upon the minutes.

*James J. Mahoney* of counsel [*George J. Stacy* with him on the brief], for the appellant.

*William J. Carey,* for the respondent.

LAUGHLIN, J.:

This is an action for personal injuries sustained by the plaintiff on the 11th day of January, 1917, alleged to have been due to the negligence of the defendant. Plaintiff was in the employ of the United Fruit Company as chief steward on its steamer *Saramacca.* On the 10th of January, 1917, the steamer was placed in the defendant's Pontoon Dry Dock No. 4 in the Erie Basin in the borough of Brooklyn, New York, for general repairs and painting. On the tenth the plaintiff left the ship after she had entered the defendant's dry dock about eleven o'clock A. M. but before she was placed in Pontoon Dry

Dock No. 4.   On leaving the ship he was obliged to cross two other ships and descend a ladder about sixty feet in height. On returning to the ship at about ten A. M. the next morning, pursuant to the directions of his employer to take a package containing laundry to the purser and to "report on the ship and   *   *   *   await further orders," the only access thereto which he saw was from the yard of the defendant and by means of a flight of about eighty steps upward from the surface of the defendant's yard to the top of a pontoon and thence over three or more pontoons end to end lengthwise along the ship with open spaces of about two and one-half feet between them and connected by removable bridges and then from the platform of one of the pontoons by a bridge or gangplank swung therefrom to the bow of the ship. As he was passing over the surface of the pontoons and the bridges connecting them, he observed that the steamer was getting up steam preparatory to sailing and he saw men crossing the bridge or gangplank from the pontoon to the ship but did not observe whether they were going on or off the steamer.   He testified that he walked along without observing what he was walking on any more than if he was "walking along any street;" that he was not observing the condition of the floor of the pontoon at all but was walking looking straight ahead at the bridge and was intent on getting aboard the ship which was the single thought in his mind; that as he thus was proceeding toward and near the bridge connecting the pontoon on which he was traveling with the pontoon on which the bridge or gangplank was swung to his ship, he slipped on some ice and fell down between the pontoon sections sustaining very serious injuries.   The question put to him next before the last was whether it was not the fact that he had an idea that the gangplank was being raised from the pontoon away from the ship and was hurrying to get there before those who were operating the bridge or gangplank got it up.   To this he answered, "I was on a quick walk, not a run, a walk, because they said 'Hurry, hurry,' and I would have been the last one on the ship and they were waiting for me."   The next and last question to the plaintiff was, "What men on the ship?" to which he answered, "Everybody on the gangway said 'Hurry, hurry,' and I was on a quick walk when my feet went from under me and I went

down." It further appears that the width of the pontoons was about twelve feet and that there was a rail along either side about waist high; that the bridges connecting them were four feet in width and twelve feet long so that they extended four and one-half feet on the surface of each pontoon and they had a like railing on either side. The plaintiff testified that he walked in the middle of the pontoon and did not see the ice before he stepped on it and that his feet went from under him and he went off the end of the pontoon to the right of the bridge he was approaching and that at the end of the pontoon between the right sides of the bridges and the right sides of the pontoons as he was walking there was an open space of about eight feet, as the bridges were at the left sides, and no railings; that he fell a distance and caught hold of the pontoon in front of him and after hanging there a short time lost his hold and fell some thirty-five or forty feet and his right foot struck a plank and his left foot went into the water up to his knee and then he grabbed a ladder and was pulled out; that he fell in all about eighty feet; that when he left the ship the day before, he understood that it would be laid up indefinitely and in the hands of the defendant for many months. One Povado, called by the plaintiff, testified that he was a waiter or messboy on the ship and had occasion to go ashore three times after it went into the dry dock and before the accident; that the first time was about four-forty-five P. M. the day before the accident and that he took the same course in going ashore and returning that the plaintiff was taking at the time of the accident and observed no other method of ingress or egress; that on the deck of the second pontoon from that on which the gangplank extended to the ship he noticed a patch of ice about fourteen inches in length and eight or nine inches wide and that this was the only place he observed ice and that he saw it there on the other two trips on the morning of the accident on one of which he was accompanied by the engineer. The engineer was not called. There is no other evidence with respect to who or how many were on the steamer or with respect to any one going ashore from the steamer or going to the steamer from the shore or with respect to knowledge on the part of the defendant concerning there being any necessity for providing a way for access to and from the ship or with respect to any duty devolv-

ing on the defendant in the premises. For aught that appears the pontoons were thus connected with one another and with the ship and drydock yard solely and only to enable defendant's employees to perform their duties. It appears that there were some employees of the defendant on the pontoons at different times and the plaintiff testified that he saw two men ahead of him on the pontoon just before he fell. The defendant's contract with the master or owner of the ship was not proved otherwise than as may be inferred from what has been stated.

One Cunningham, called by the defendant, testified that he helped dock the steamer the day before and was not on the pontoon at the time of the accident but that the defendant was about to lower the *Saramacca* to the water and she had steam up and was ready to pull out as soon as lowered and that steam was coming out of her exhaust and froze where it struck as the temperature was seventeen degrees above zero. Other employees of the defendant testified that at the time of the accident they were engaged in taking in the gangplank that led from the pontoon to the ship; that steam was up and the ship was ready to sail and steam from the exhaust of the ship fell on two of the pontoon sections and around the point where the plaintiff fell and froze as it fell; that the gangplank had been lifted about a foot from the ship and that the plaintiff was hurrying. The official in charge of the Government Weather Bureau was called by plaintiff and asked with respect to the precipitation for some time preceding the accident and the defendant on cross-examination showed by him the temperature. His official records showed that the temperature had been constantly above the freezing point from the first of January to the seventh; that on the seventh the lowest temperature was thirty-two, the highest forty-seven and the mean forty; that on the eighth the highest was forty-three, the lowest twenty-eight and the mean thirty-six; that on the ninth the lowest was thirty-six, the highest forty-seven and the mean forty-two; that on the tenth the lowest was thirty-three just before midnight, and the highest forty-nine and the mean forty-one; that on the eleventh the lowest was nine and the highest thirty-three at midnight of the day before and that it reached the freezing point about one A. M. The surfaces of the pontoons were in the open where, notwithstanding the

testimony of Povado, it is conclusively shown by the official records of the Weather Bureau ice could not have been formed on the deck of the pontoon between the eighth of January and the time he testified he first saw the ice which was on the tenth, and that there could have been no ice there from natural causes unless there was a very large accumulation of ice at that point before the temperature was such that it would necessarily disappear. It was not satisfactorily shown that the plaintiff slipped on the ice Povado claims to have seen the afternoon before the accident. I am of opinion that the only reasonable inference to be drawn from the evidence is that the ice on which the plaintiff slipped was formed by the freezing of the exhaust steam from his ship that morning. The meagre facts presented by this record are quite insufficient to show that the defendant was under any obligation to provide a means of access to the ship for the plaintiff or others employed thereon, or that it owed them any greater duty than as mere licensees. Moreover, the plaintiff failed to show the exercise of due care. The recovery, therefore, cannot be sustained.

It follows that the judgment and order should be reversed and the complaint dismissed, with costs to appellant to abide the event.

CLARKE, P. J., SMITH, MERRELL and PHILBIN, JJ., concur.

Judgment and order reversed, with costs, and the complaint dismissed, with costs.